And we'll turn to the last case on our calendar this morning, George Elias v. Rolling Stone. Good morning, Your Honors. Go ahead, Mr. Frank. My name is Alan Frank. I have the pleasure this morning of representing George Elias IV, Stephen Hadford, and Ross Fowler in connection with their appeal from Judge Castle's recent decision and memorandum pertaining to their defamation claim against Rolling Stone. May it please the Court. The District Court erred when it dismissed the plaintiff's amended claim on a 12B motion basis. Your Honor's standard review in this case, as I understand it, is de novo, and when reviewing an of and concerning requirement in defamation case such as this, the question for Your Honors is whether at least one reasonable interpretation is in fact of and concerning the plaintiffs. The article was published in about the third week, I think November 19 of 2014. It was followed with a podcast. Within hours, dozens of reporters were knocking on doors and making telephone calls and what have you with respect to these three specific individuals, among others certainly. Where were they at the time? They had graduated. The timeline is... How and why did, in your view, people or the press or the media descend on them in particular? That's a great question, Your Honor, and a question we've really been grappling with since that period of time. The alleged rape occurred in the fall of 2012. The article was published in the fall of 2014. There was a two-year hiatus. At the time of the rape, there were 53 members of the fraternity, some of whom lived in the fraternity house and some of whom lived outside the fraternity house. Within the ambit of the article published in 2014, however, Dean Aramo said that, I believe the perpetrators have all graduated. That reduced the 51 members of the fraternity to a total of 31. There were 31 juniors and seniors. One of the people, Mr. Elias, lived in the room at the top of the stairs on the second floor. That was the only room accessible. Everybody knew this. Another individual was seen riding his bike on a regular basis, according to the article, around campus, even though he had graduated. That fit only one description. That was Mr. Hadford. With respect to Mr. Fowler, he had been the Rush chairman in the 2010-2011 year and was active and well-known in this community. It is, of course, we're talking about the fishbowl of that community. That's the context, I think, in which we really need to review these facts respectfully. Under those conditions, these folks were linked. We think the immediacy occurred because of the Internet. We're living in a different age than many of these cases were written in. Elias and Fowler, Fowler also has the characteristic of the swimming, of the avid swimmer slash non-lifeguard piece. Is that characteristic important from your perspective to identifying him? It is. If it is, then what do you do in a situation where you've got the character in the article, Drew, who in fact is a composite of a couple of your plaintiffs? Is there another case where you've got such a situation? In other words, Drew is both the lifeguard, which your client Fowler is saying is equivalent or at least a characteristic analogous to avid swimmer. Drew also is Elias, who lives at the top of the second floor. If you need to do a checklist to try to see if a particular individual fits the characteristics of the individual in the article, you're going to need to take a couple of different people. Yes, you are. What do we do with that? Well, first of all, Your Honor, the question is a great question, but in truth, the defamation is as to the community in which they were situated and in which they were in context. One person could view Drew as representing Mr. Elias, whereas another reasonable interpretation of representing Drew could be one of the other. What if you knew that Mr. Elias, as it's alleged, Mr. Elias was known to have lived in this particular location for a couple of years, and people know that Mr. Elias is not a swimmer? So if you're doing your checklist, you'd think, well, it can't be him. Now, if you're doing Fowler, you would do the opposite. You would say, well, you've got the swimming, but it can't be him because he didn't live in that location. There were seven alleged perpetrators, and there were two – there were nine people allegedly participating in this rape. I don't think we're – and it was a gang rape, and it was part of an alleged – I'm sorry, seven or nine? Seven participated, Your Honor, and two more looked on, as I understand it. And we believe that the group, in answer to your question, Your Honor, individual members within that subset of a reasonably ascertainable group with a name, with a structure, with roles in the community and in the fraternity, well-known to people such as they were, would easily make the connection. Your answer is really that you have two theories. One is that the article defamed individuals who could be discerned as individuals. And the other, presumably in answer to Judge Forrest's question, is you've got this group defamation – small group defamation theory. We do. And with respect to the small group defamation case, we do, as my colleague in her appellee brief suggests at page 39, place primary reliance on the Brady decision from 1981, which really tracks through the standards set forth by the appellate division here in New York with respect to establishing what is necessary for a small group. It's not solely about the number. It involves the number. We know we're down to 31. There is, in appellee's brief, a concession to that effect. In the very beginning of it, appellee's counsel says, we don't disagree that you're down to 31. 1953, back in 2012, narrowed down to 31. But the Brady case, which is developed by my colleague beginning at page 39, which we in turn have placed primary emphasis on, develops the intensity of suspicion, I guess test or analysis, and that goes through a number of things. And it includes things such as the composition of the group, the degree of organization of the group, the prominence of the group, how well-known the members of the group are. And this is not some group of people that are grouped together solely by virtue of the article being written about, for example, landowners. Rather, this is an article and a podcast, both, discussing a reasonably highly structured organization where membership is controlled, where people have rank and role, where, at least according to the amended complaint and my client's belief, the group is prominently known on campus, where in the image of the community and the moniker is listed. The fraternity class list was published, as I mentioned, every single semester, every single year at least, and it didn't take people very long to go back and determine who was allegedly part of the practice of gang-raping women as an initiation right into the community. Where was this publication? This was in the Rolling Stone magazine, Your Honor. Oh, no. You said that the list was annually published. On the Internet, Your Honor. Under what? Under the website of the fraternity itself? I believe so, Your Honor, yes. As to the personal identification of the members within the group, Your Honor, the test as we understand it is whether a reasonable reader could have concluded that the publication was conveying facts about the plaintiff. Is Drew someone that is, in the reader's mind, reasonably understood to be Mr. Fowler, for example? Is one of the rapists inevitably the person that lived in the very room where she was allegedly raped? Just help me remember this. Do you refer to a specific room as Drew is going up the stairs? Let me clarify that. The room is on the second floor, that part, and the room is said to be a dark room, but it's at the top of the stairs, which means the second floor. Extrinsic evidence, and known to the community generally that these people were involved in, includes a keypad precluding access to any other room on the second floor without knowing the keypad number. So we believe through those two things, as the identification of the room darkened as it was at the top of the stairs, which would be the second floor, juxtaposed with the keypad inevitably pointed at least reasonably, one could reasonably conclude that that was the room, and by virtue of him living in that room, that would have inevitably pointed to him. Do you claim in your complaint that it inevitably did point to him? Yes. Thank you. And what was the theory or the factual underpinning of such a claim? We believe that a—well, the evidence was, and we've recounted that in our complaint, that they were virtually assaulted by the news media. This article was picked up and reprinted many times. It became national news overnight. It still is in the news. Why don't you just—since this was 12b-6, maybe we can have the benefit of your refreshing our recollection about the complaint. What do you claim in your complaint actually happened to them as a result of this publication? We believe that these people, at a minimum, were accused nationally of participating in a criminal gang rape. And their reputations were deeply affected. One of the people, Mr. Hadford, was denied admission to medical school for one year in a place where he wanted to go, and he believes, and we may be able to deduce testimony during discovery, that one of the reasons was that all this information had emerged. Another had people at work, people who he knew socially, others, colleagues, and we've alleged this in the complaint, look at them differently, speak with them differently, deal with them differently. These were young people. They're still young. At the time of the article, three years ago, they probably would have been 23 or 24 years old. We believe their reputations were significantly sullied. Today, and we've alleged this in the complaint, if Your Honor punches in their names in a Google search, you will see many articles about their relationship to these events. So we believe all of that is cognizant. Contemporaneous? Oh, yes. Oh, yes. Was there anyone else, any other member of the fraternity who was also identified in these chats? No, not that I'm aware of. Now, Your Honor is probably aware that Dina Ramo was named specifically, and her case went to verdict, and that was subsequently settled confidentially, I think, a month ago. The fraternity brought its own claim as an entity, but not for individual members, and we've attached as Exhibit A to our pleading a decision from, I think it's Richard Moore, a trial court judge in the Commonwealth of Virginia. Virginia, actually. Yeah, on August 31, 2016, and he very, you know, it's a demur, he's writing an opinion with respect to a demur, denying the demur, addressing the oven concerning requirement, and that analysis for Judge Moore was different than your analysis, because in the article the fraternity is specifically named, whereas my clients were not specifically named. But otherwise, I believe the analysis that Judge Moore supplies is spot on, because he rejects the idea that, at least for demur purposes, subsequent evidence being presented during discovery, and a trial that this was not defamation somehow, and he rejects as well the opinion, sorry, the defense, that this was nothing more than opinion testimony because of the use of the word seems and given the overall context and the happening that fall in 2014. And what's the status of the fraternity's litigation in the Commonwealth? I do not know, but I believe my colleague does, as she's counsel. She'll tell us.  Thank you all. It's a pleasure appearing this morning. May it please the court. My name is Elizabeth McNamara, and I'm representing the defendant's appellee in this action. I'd like to just begin, before I turn really to my argument, to correct one statement by my adversary just at the end in answer to Your Honor's question. There have not been, nor does this record contain, any news articles that specifically identify these three individuals as among the rapists of Jackie. The only thing that is in this record and the only evidence that I'm aware of that in any way incorporates their name is at the record of the supplemental record at page 16. It is a forum. It was basically an internal blog post with people just posting and ruminating, and included in that forum on that page that I've identified in the record, there's a list of all the inductees into Phi Kappa Psi in 2010, a list of all the individuals, and amongst them are the three individuals here. Also contained in that forum is commentary concerning this, specifically identifying that this is nothing more than a list of everybody that went in, and we're not saying that these were necessarily the rapists. So I do not think it's correct in the record that there's been any publication via a Google search or any other way that specifically identified these three individuals. You're saying that every individual, or at least those listed on Essay 16, was named. Yes, that they were named as just being nothing more than inductees into fraternity. They were not specifically identified as being amongst the rapists. No. This raises one of the issues that the district court doesn't address specifically in its discussion, which is, well, they're actually, for each of the three plaintiffs, the district court focuses really on the unique characteristic, if you will, whether it's going to be at the top of the stairs, the bike riding post-graduation, and the swimming in the pool. But there are other facts that are alleged in the complaint that the district court doesn't really discuss, although they're mentioned in the statement of facts, including that others immediately identified the plaintiffs. Now, I understand what you're saying, which is that there's no articles which mention them, but taking that to sort of by looking at what's alleged in the complaint in terms of whether the world or the relevant group understood that the article was referring to these plaintiffs, there are facts alleged that they were immediately identified, and also two other facts that are applicable to each of the three plaintiffs that weren't discussed in the discussion section, which included that they were at the right frat at the right time. So those three facts, what do we do with the fact that they weren't dealt with? I think, well, first of all, Your Honor, I think that that's a generous reading of the complaint. I think the complaint merely conclusively, I think, identifies that they were amongst people who were shunned or questioned or people, you know, frowned upon them after as a member of the frat. I'm not sure that there is any specific factual allegation in this complaint that I'm aware of, that they were specifically identified and accused of being amongst the rapists. However, I think that the fact of the matter is what did or did not happen after the fact is not determinative of whether the article itself can reasonably be understood as being of and concerning these plaintiffs in identifying them. That is the touchstone for the analysis. It doesn't matter, as was found in Three Amigos, the court of appeals decision, as was found in Springer, which we also cite in our papers, another court of appeals decision, the fact that a plaintiff was specifically identified after the fact as being the person identified or the person discussed in the respective work is not determinative of whether it can be reasonably found that the article itself is of and concerning the person. Does it add to the plausibility, though, of the allegation in the context of a 12b-6? I would say no in these circumstances because I think the plausibility, the facts that they've alleged are so remote and so untethered to the language of the article. And if I may, I'd like to really focus, because I think it's important at the outset to distinguish between the plaintiff's two theories here. The first theory is that various extrinsic evidence that we've been talking about here this morning, the location of Mr. Elias's room, swimming, and the like, that these extrinsic facts specifically identify them as being amongst Jackie's rapists. What has not been said that is a critical fact in that prong of their argument is that under their own analysis and under their own theory here, this was supposedly an initiation ritual for people being inducted into the fraternity. However, as their complaint makes clear and as it's evidenced even in the documents they're saying about their identifiability, they joined the frat in 2010, two years before the alleged rape of Jackie, and that the events being depicted in the article are in the fall of 2012. And under their theory, if this was some form of an initiation ritual, they had already been initiated, and it's not logical or plausible to assume that they would have been participating in an initiation ritual to a fraternity that they had been a member of already for two years. So that brings us to the second argument, which is the small group libel claim, which I think is really the focus of their argument here, and the only one that I think they have devoted most of their energy to, and the court below did as well. Their theory there is that, and when you focus on this, their theory is that the article, A Rape on Campus, was of concern to them because readers would reasonably conclude that the claim that all members of Phi Psi had to engage in gang rape and rape as a condition of membership. So pushing this argument, what the appellants are arguing is not that they were participants in Jackie's rape, but rather because there was a condition of rape to enter this fraternity in some undefined time not talked about in the article, they also had engaged in rape or gang rape, and so they were defamed in that way. Now the court below found that neither theory was supported by the clear language of the article or the law and dismissed. And we ask this court to affirm, but let me focus further on the group libel argument. First, it's important to understand or to remember that the oven concerning component to libel, as this court found in Church of Scientology v. Behar, as well as a number of other cases, that it is ordinarily resolved at the pleading stage. Next, with regard to a small group libel claim, this court has addressed a number of attempts to frame claims under group libel theories and has rejected every one. And in each and every case, the touchstone of case that is looked at and distinguished, and we submit should be distinguished and looked at here as well, is Brady v. Ottawa newspapers. That was referred to by my colleague, my adversary here. And Brady, it's important to focus on the facts of Brady because it really dictates, I think, the outcome here. There are concerned statements about all members of a group that was explicitly defined. The quote was that all members of the police were accessories after the fact. In context, it was expressly understood that this referred to the unindicted police officers of the city of Newburgh in 1972. Thus, the court found that the group was definite, the size was fixed, and the statement in the article was applied to all members. And it's critical in this analysis that you look at the language of the article, not after the fact arguments or suppositions to focus and narrow and define this group. It's how the group is defined in the article. And here, if you accept that it's logical or plausible to accept that the article actually alleges that there was a precondition to membership in Phi Kappa Psi that applied to members that you had to engage in gang rape in order to become a member, the article provides no boundaries to that restriction. And equally fatal, we do not believe... Well, your adversary says that you have actually conceded that this is limited to 31. Well, I think what we did is that we acknowledged that... And that really, the 31, goes to their specific identification theory. They're kind of mixing apples and oranges. That could also be used in this small group defamation theory. It could, and then I think... And the Judge Costell below, I think, dealt with that issue, and I think appropriately so. He identified, okay, if you accept that Dina Ramo mentioned in the article that all the boys had graduated, so that would mean that they had to have graduated in 2013 or 2014, and that puts us down to 31 members. There is nothing in this article to distinguish among those 31 members. There is nothing to distinguish as to which of those 31 members were supposedly the alleged rapists. If in the podcast or in the article the statement had been made that this was in the context of these 31 members, that the fraternity had, as part of its initiation rights, a gang-rape requirement, would you be making the argument that you're making now? Yeah, I would, Your Honour, because I still think under the Brady analysis you have to have a fixed group in time, and I don't think that you could say that it was plausible that those 31... What you're saying, because if they graduated, they didn't rape Jackie. That can't be, because if the initiation ritual... You have to marry both components to their argument. If it was an initiation ritual, it had to occur in 2010, when they were initiated into the fraternity, not in this alleged rape in 2012. So we're talking about... I don't quite understand. In 2012 they were still there, right? They were still there, Your Honour, yes. Initiation rituals, I suppose, involve not only the persons who are being initiated, but those who were initiating them. Well, moreover, under their allegations, Your Honour, it even applies to a wider group. They plead in this case that the participants would have been either members of Phi Psi or Rashis. So we are talking about a broader group, not necessarily limited to the members of Phi Kappa Psi, but rather anybody who could have been at that party who might have been interested in the fraternity, who might have been inclined to rush to the fraternity. It is not a number that's limited to the 31 or to under their own allegations. You have to bring together all the elements. But I think it's important to focus on, is it reasonable to assume, reading this article, that this really was an initiation ritual that required, over years, all members had to participate? And there's many statements in this article that is inconsistent with that, and the Court has to look at the article in context. It is called A Rape on Campus. It is referring to Jackie's rape, the subhead, which encapsulates the content of the article, refers solely and exclusively to Jackie's rape. At another point in the article, it talks about that the culture of UVA, the rapes at UVA, was something that was within the norm and in keeping with other colleges. I would suggest that all of us would agree that an initiation ritual that applies across at least under their standards 2 to 3 years, where all members were required to engage in rape to enter a fraternity, would not be something that is consistent and within the norm and consistent with other colleges. It is arguably inherently implausible. And it is a requirement for the group theory that it has to apply to all members. It can't just be some of the members. We saw that in Algeron versus Town of Walk Hill out of this court, where there was a statement that applied to some members but not all members. That is not sufficient to state a claim under the group libel doctrine. What was the size of the group in the city of Newburgh? It was 28, I believe. And that was rejected. Oh, the city of Newburgh. I'm sorry, Your Honor, I was talking about Algeron. In the city of Newburgh, there were 56. But what distinguished the city of Newburgh is, as I've indicated, the statements. And you have to look at the statements. It's not establishing otherwise. The statements in the article that were at issue specifically limited and defined the group to be those 56. It was the unindicted officers who were present in 1972. That was a defined group. You could go and determine precisely who they were. There is no language in this article that defines or tethers the outreaches of this group. They say it reaches back to them from being initiates in 2010, but they also point to, as we've noted in our papers, the fact that a gang rape had occurred at the fraternity in 1984. My problem is that you started your argument by pointing us to page 16 of the supplemental appendix. That's a defined list of people. That's a defined list of the people that were initiates in 2010. However, if you look at the context of that list, there were also people who joined the fraternity in 2011, people who joined the fraternity or were rushing the fraternity in 2012. That's not the universe, that list. There's nothing in the context of how that list was published that that was the limited universe. But more important, it's not relevant, really, what occurs after the fact and how you're identified. It's what is in the article, and does the article define a precise group that is fixed in time and definite and statements in the article that necessarily apply to all members of this defined and fixed group. And that's where their claim falls apart and it fails. There's nothing in this article or their arguments that's a moving target as to who are the members of this group and whether it's fixed and defined. Thank you very much, Your Honors. Yes, yes, of course. I'll be less than 60 seconds. It's my understanding that in the Newberg case, which I called Brady, there were over 70 people, policemen, spanning several years, and no one was ever really sure about the total number. It was at least 70, and the court was clear about that. More than. Eighteen of them were indicted. Of the remaining 53 known to be in the class, 27 of them filed suit. We think our case, respectively, is identical, virtually identical, substantively identical to the Brady case. Thank you very much. Thank you very much. We'll reserve the decision. We are adjourned. Court is adjourned.